UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
HAROLD BONNIKSON,                         :
                                          :   Case No.: _____
            Plaintiff,                    :
                                          :   **COMPLAINT**
    -against-                             :
                                          :   **DEMAND FOR JURY TRIAL**
LADENBURG THALMANN FINANCIAL              :
SERVICES INC., RICHARD J. LAMPEN,         :
ADAM MALAMED, MARK ZEITCHICK,             :
RICHARD M. KRASNO, HOWARD M.              :
LORBER, HENRY C. BEINSTEIN, GLENN         :
C. DAVIS, BRIAN S. GENSON, MICHAEL S.     :
LIEBOWITZ, and JACQUELINE M. SIMKIN,      :
                                          :
            Defendants.                   :
----------------------------------------- X

Plaintiff Harold Bonnikson ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Ladenburg Thalmann Financial Services Inc. ("Ladenburg" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Ladenburg, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between Ladenburg and Advisor Group Holdings, Inc. ("Advisor Group").

2. On November 11, 2019, Ladenburg entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which the Company's shareholders will receive $3.50 in cash for each share of Ladenburg common stock they own (the "Merger Consideration").

1

3. On December 6, 2019, in order to convince Ladenburg shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading preliminary proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Ladenburg; and (ii) the valuation analyses performed by Ladenburg's financial advisor Jefferies LLC ("Jefferies"), in support of their fairness opinion.

5. The special meeting of Ladenburg shareholders to vote on the Proposed Merger is forthcoming (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Ladenburg shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

2

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

9. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Ladenburg maintains offices in this District, meetings during the sales process were held in in this District, and the Shareholder Vote will take place in this District. Moreover, Ladenburg's common stock trades on New York Stock Exchange, which is headquartered in this District, Ladenburg hired Sullivan & Cromwell LLP as a legal advisor, Jefferies as a financial advisor, and Georgeson LLC as a proxy solicitor for the purposes of the Proposed Merger, all of which are also located in this District, and the closing of the Merger Agreement and consummation of the Proposed Merger are scheduled to take place in this District rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

**PARTIES**

10. Plaintiff is, and at all relevant times has been, a holder of Ladenburg common stock.

11. Defendant Ladenburg is a financial services holding company. The Company maintains offices at 277 Park Avenue, 26th Floor, New York, New York 10172. The Company's

common stock trades on the NYSE under the ticker symbol "LTS".

12. Individual Defendant Richard J. Lampen is, and has been at all relevant times, the Chief Executive Officer and President of the Company and Chairman of the Board.

13. Individual Defendant Adam Malamed is, and has been at all relevant times, an Executive Vice President, the Chief Operating Officer, and a director of Ladenburg.

14. Individual Defendant Mark Zeitchick is, and has been at all relevant times, an Executive Vice President and a director of Ladenburg.

15. Individual Defendant Richard M. Krasno is, and has been at all relevant times, the Lead Independent Director of Ladenburg.

16. Individual Defendant Howard M. Lorber is, and has been at all relevant times, the Vice Chairman of the Board. Lorber is also the president, chief executive officer, and director of Vector Group, the Company's largest shareholder.

17. Individual Defendant Henry C. Beinstein is, and has been at all relevant times, a director of Ladenburg. Beinstein is also a director of Vector Group.

18. Individual Defendant Glenn C. Davis is, and has been at all relevant times, a director of Ladenburg.

19. Individual Defendant Brian S. Genson is, and has been at all relevant times, a director of Ladenburg.

20. Individual Defendant Michael S. Liebowitz is, and has been at all relevant times, a director of Ladenburg.

21. Individual Defendant Jacqueline M. Simkin is, and has been at all relevant times, a director of Ladenburg.

22. The Individual Defendants referred to in ¶¶ 12-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Ladenburg they are referred

to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Background and the Proposed Merger

23. Ladenburg is a financial services company engaged in independent brokerage and advisory services, investment banking, equity research, institutional sales and trading, asset management services, wholesale life insurance brokerage and trust services. It operates through three segments: the independent brokerage and advisory services segment, the Ladenburg segment and the insurance brokerage segment. The independent brokerage and advisory services segment includes the broker-dealer and investment advisory services provided by its independent broker-dealer subsidiaries to their independent contractor financial advisors and the wealth management services provided by Premier Trust, Inc. The Ladenburg segment includes the investment banking, sales and trading and asset management services, and investment activities. The insurance brokerage segment includes the wholesale insurance brokerage activities provided by Highland Capital Brokerage, Inc.

24. Advisor Group is a Delaware corporation and is one of the nation's largest networks of independent financial advisors serving over 7,000 advisors and overseeing $271 billion in client assets. Headquartered in Phoenix, Arizona, Advisor Group is mission-driven to support the heroic role that advisors can play in the lives of their clients, offering securities and investment advisory services through its subsidiaries FSC Securities Corp., Royal Alliance Associates Inc., SagePoint Financial, Inc. and Woodbury Financial Services, Inc., as broker/dealers and registered investment advisors.

25. On November 11, 2019, Ladenburg issued a press release announcing the Proposed Merger, which states in relevant part:

**Ladenburg Enters into Definitive Agreement to Be Acquired by Advisor Group Capital Partners for $3.50 per Share**

The Companies Will Form Leading Multi-Custodial and Multi-Clearing Network of Firms, Supporting Financial Advisors Through Multiple Distinct Brands and Cultures

Highly Complementary Capabilities and Talent to Drive Enhancements in Technology, Practice Management and Service for Advisors Across Both Companies

Ladenburg Firms Will Not Be Merged with Advisor Group Firms, Reflecting Both Companies' Shared Commitment to Multi-Brand Network Model

PHOENIX, Nov. 11, 2019 /PRNewswire/ -- Advisor Group, one of the nation's largest networks of independent wealth management firms, and Ladenburg Thalmann Financial Services Inc. (NYSE American: LTS, LTS PrA, LTSL, LTSF, LTSK, LTSH) ("Ladenburg"), a publicly-traded diversified financial services company, today announced that both companies have entered into a definitive merger agreement to join the two companies.

Under the terms of the transaction, Ladenburg has agreed to be acquired by Advisor Group through a cash merger, in which each outstanding share of Ladenburg's common stock will be converted into a cash payment of $3.50 per share. The total enterprise value of the transaction is approximately $1.3 billion, taking into account Ladenburg's common stock, preferred stock and outstanding debt. The definitive merger agreement and the transactions contemplated were unanimously approved by Ladenburg's Board of Directors.

The transaction, which is subject to customary closing conditions, including the approval of Ladenburg's shareholders, and receipt of required regulatory clearances and approvals, is expected to close in the first half of 2020.

Following the completion of this transaction, the expanded Advisor Group organization will continue to be led by its current CEO and President, Jamie Price. When the transaction is completed, Advisor Group's leadership team will include senior executives from both Advisor Group and Ladenburg. Ladenburg's firms will not be merged with Advisor Group's firms, reflecting both companies' commitment to a multi-brand network model.

Advisor Group's network of firms consists of FSC Securities Corporation, Royal Alliance Associates, SagePoint Financial and Woodbury Financial. Ladenburg's independent advisory and brokerage firms include Securities America, Triad Advisors, Investacorp, KMS Financial Services and Securities Service Network (SSN).

Additional Ladenburg subsidiaries include Highland Capital Brokerage, a leading insurance solutions brokerage; Premier Trust, a financial advisor-focused trust

services company; and Ladenburg Thalmann & Co., a middle market investment bank. Each of these subsidiaries has played a role in delivering unique, value-add solutions to Ladenburg-affiliated financial advisors.

Ladenburg Thalmann Chairman, President and CEO Richard Lampen said, "This is a transaction that maximizes value for our shareholders, while positioning our financial advisors for continued growth and success. We have always been impressed with Advisor Group's platform, offerings and leadership. Advisor Group's CEO, Jamie Price, and his management team offer a mature shared services model and a demonstrated ability to innovate and invest in ways that help advisors grow. We are confident this transaction will help our advisors accelerate the growth of their businesses, while enabling them to benefit from the highly personalized service experience they have always enjoyed, under a very similar multi-custodial, multi-clearing and multi-brand structure."

Advisor Group President and CEO Jamie Price said, "This acquisition brings together the best of two industry leaders, to the benefit of the financial advisors we collectively serve. We believe that the investments necessary for competitively differentiated technology, practice management, products and service excellence require a greater level of scale than either of our companies can achieve on a stand-alone basis. In fact, as our two organizations learned more about each other's platforms, it became obvious that our strengths rounded out each other's offerings, and combined, we will have one of the most comprehensive and best-in-class platforms for financial advisors in the industry. Equally important, Advisor Group and Ladenburg have a shared commitment to the flexibility of third-party clearing, together with maintaining a 'small firm feel' delivered through the distinct management teams and cultures of a multi-brand network model. In today's fast-consolidating marketplace, where advisors fear becoming just another number in the crowd, the more intimate service culture and sense of community that our multi-brand approach offers is increasingly in demand."

Milton Berlinski, Co-Founder and Managing Partner of Reverence Capital Partners, a leading financial services-focused private equity firm and majority equity owner of Advisor Group, said, "Ladenburg Thalmann and Advisor Group are highly complementary businesses, with nationwide footprints, technology capabilities and senior management talent that represent the best of what the wealth management industry has to offer for financial advisors and their clients. By combining these two firms, we have created one of the most robust platforms in the country to support advisors' growth, with the scale, resources and intellectual capital to position them for success, no matter their business model or client focus."

Giving Advisors the Best of the Best in Platforms, Tools and Expertise

Following the completion of this transaction, Advisor Group will continue to operate under a multi-brand network model of firms, enabling the delivery of industry-leading tools and expertise through distinct firms with unique brands that each offer a sense of community and personalized service for affiliated financial advisors.

7

Financial advisors affiliated with Ladenburg's subsidiary firms are expected to benefit from Advisor Group's recent investments in cutting-edge enterprise-level service offerings, including eQuipt, the firm's fully-digital client onboarding system; MyCMO, its personalized advisor marketing platform; MySuccessionPlan.com, its suite of bundled succession planning resources; and its integrated CyberGuard Program for cybersecurity.

For advisors affiliated with Advisor Group, the transaction brings access to Ladenburg Thalmann's industry-leading practice management capabilities, wealth management resources, advisor-client portal technologies and expanded national scale.

The two companies also feature strong cultural similarities, including a shared commitment to supporting greater diversity across the industry, including advancing career opportunities for women financial advisors and women executives, as evidenced by Advisor Group's Women Forward initiative and the Ladenburg Institute of Women & Finance.

Multi-Custodial, Multi-Clearing Approach Minimizes Disruption and Maximizes Flexibility; Positions Company for Future Leadership in RIA Segment

Upon the transaction's completion, Advisor Group will be one of the industry's leading providers of a multi-custodial, multi-clearing model that drives maximum choice and flexibility for financial advisors.

Because both Advisor Group and Ladenburg use Pershing and National Financial (part of Fidelity Custody & Clearing Solutions) as their largest clearing providers, no repapering of client accounts will be necessary in connection with this transaction and its closing.

As one of the largest multi-custodial and multi-clearing networks of firms in the country, the company will be even better positioned to redefine the RIA segment of the wealth management space. The combined company will be able to support all financial advisor business models, including the hybrid advisor doing both securities and advisory business, as well as the "investment advisor only" professional who is either utilizing a corporate RIA platform, or has an independent RIA.

Adam Malamed, Executive Vice President and Chief Operating Officer of Ladenburg, said, "The ongoing evolution of our industry validates the importance of Ladenburg and Advisor Group's respective roles as the leading innovators of the network model of firms approach within our industry. The appeal of bringing Ladenburg and Advisor Group together is driven in large part by our shared vision for driving a transformative and innovative approach to the wealth management space. For example, among the many advantages of our multi-custodial, multi-clearing capabilities are the expertise and leadership we can further build in the RIA space. The combination of Ladenburg and Advisor Group creates a unique offering

for financial advisors who are primarily fee-based, or fee-only, whether they want to have their own RIA under a turnkey level of back and middle office support, or would prefer to do fee-only work through a corporate RIA, without having to also hold securities licenses on the brokerage side of our industry."

26.      The Merger Consideration represents inadequate compensation for Ladenburg shares. Indeed, the Merger Consideration represents a 13% *discount* to the 52-week high trading price of Ladenburg common stock leading up to the announcement of the Merger Agreement. Further, in each of the past two quarters, Ladenburg outperformed expectations by beating revenue estimates. Given the Company's strong recent financial performance and bright economic outlook, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

**II.      The Proxy Omits Material Information**

27.      On December 6, 2019, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

<u>The Misleadingly Incomplete Financial Projections</u>

28.      First, the Proxy omits critical financial projections, including the cash flow and net income projections for Ladenburg (the "Omitted Projections"). Defendants elected to summarize the projections for Ladenburg but they excised and failed to disclose the Omitted Projections. These omissions render the summary of the projections table on page 37 of the Proxy materially incomplete and provide a misleading valuation picture of Ladenburg.

29.      There are significant differences between cash flow projections—widely

9

recognized as the most important valuation metric when it comes to valuing a company and its stock—and the EBITDA projections that are included in the Proxy. EBITDA projection metrics are not sufficient analogs for cash flow projections. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[2] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3] As a result of these material differences between EBITDA and cash flows, experts recognize cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

30. In light of the significant differences between the Omitted Projections and the figures disclosed in the Proxy, the table of projections on page 37 of the Proxy is materially incomplete and misleading. By failing to include the Omitted Projections, the table provides a materially incomplete and misleading overall valuation picture of Ladenburg.  Simply put, net income and cash flow projections are irreplaceable when it comes to fully and fairly understanding a company's projections and value.

31. Unlike poker where a player must conceal his unexposed cards, the object of a

---

[1] Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").
[2] Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.
[3] Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections but have omitted the cash flow and net income projections. These omissions render the summary of projections included in the Proxy misleadingly incomplete.

The Misleadingly Incomplete Summary of Jefferies' Fairness Opinion

32.     The Proxy describes Jefferies' fairness opinion and the various valuation analyses performed in support of their opinion. Defendants concede the materiality of this information in citing Jefferies' fairness opinion and their valuation analyses among the "material" factors the Board considered in making its recommendation to Ladenburg shareholders. Proxy at 34; *see also* Proxy at 40 ("The following is a summary of the material financial analyses provided to the Board and performed by Jefferies in connection with its opinion."). However, the summary of Jefferies' fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Ladenburg shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Jefferies' fairness opinion in determining how to vote on the Proposed Merger. *See* Proxy at 40 ("Considering the data below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Jefferies' financial analyses."). This omitted information, if disclosed, would significantly alter the total mix of information available to

Ladenburg shareholders.

33. In summarizing the *Discounted Cash Flow Analysis* prepared by Jefferies, the Proxy fails to disclose the following key information used in the analysis: (i) Ladenburg's cash flow projections; (ii) the WACC/CAPM inputs underlying the discount rate range of 11.50% to 12.50%; and (iii) the actual terminal values calculated.

34. These key inputs are material to Ladenburg shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

35. Without the above-omitted information, including the cash flow projection, Ladenburg shareholders are misled as to the reasonableness or reliability of Jefferies' analyses, and unable to properly assess the fairness of the Proposed Merger. As such, these material

12

omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

36. Next, in summarizing Jefferies' *Selected Public Companies Analysis* and *Selected Transactions Analysis*, the Proxy fails to disclose the individual multiple of each company or transaction utilized in the analyses. A fair summary of a comparable companies or transactions analysis requires the disclosure of the individual multiple for each company or transaction used in the analysis. Merely providing the range or median of the multiples that a banker calculated without any further information is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of this analyses provided in the Proxy misleading.

37. Similarly, in summarizing Jefferies' premiums paid analysis, the Proxy fails to disclose the identity of the transactions or the individual premiums observed. The Proxy simply states the quartiles. This disclosure is insufficient and renders the summary misleadingly incomplete.

38. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to cast an informed vote regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

39. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

41. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

42. The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

43. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Ladenburg; and (ii) the valuation analyses performed by Jefferies in support of their fairness opinion.

44. In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts

existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

45. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Jefferies reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Jefferies, as well as their fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Jefferies' analyses in connection with their receipt of the fairness opinion, question Jefferies as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy

or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

47. Ladenburg is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

48. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of Ladenburg shareholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

49. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50. The Individual Defendants acted as controlling persons of Ladenburg within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

53. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable

injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of Ladenburg shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 12, 2019            **MONTEVERDE & ASSOCIATES PC**

                                               By: */s/ Juan E. Monteverde*
                                                    Juan E. Monteverde (JM-8169)
                                                    The Empire State Building
                                                    350 Fifth Avenue, Suite 4405
                                                    New York, NY 10118
                                                    Tel: (212) 971-1341
                                                    Fax: (212) 202-7880
                                                    Email: jmonteverde@monteverdelaw.com

                                                    *Attorneys for Plaintiff*